**CONSUMERS PRODUCE CO., INC., of Pittsburgh and Golden Triangle Packing Company, Inc.; Consumers Brokerage Services, Inc.; Aaron Produce, Co.; Altemus Farms; Tom Ayoob Inc.; Chiquita Brands, Inc.; J.E. Corcoran Company; Demase & Manna, Co.; Garnand Marketing; Hansen Fruit and Cold Storage; A.M. Mantia, Inc.; Meize Jet Air Sales, Inc.; C.H. Robinson Company; Saginaw Bay Potato Co-op; H.C. Schmieding Produce Company; Sunkist Growers, Inc.; Tri–Car Sales, Inc., and Union Fruit Auction, Co.; Always Fresh Produce, Inc., Appellees,**

v.

**VOLANTE WHOLESALE PRODUCE, INC.; Union National Bank of Pittsburgh, Consumers Produce Co., Inc. of Pittsburgh; Tom Ayoob, Inc.; C.H. Robinson, Co.; J.E. Corcoran Co.; Golden Triangle Packing Co.; H.C. Schmieding Produce Co.; and Mieze Jet Air Sales, Inc., Appellants.**

No. 93–3050.

United States Court of Appeals,
Third Circuit.

Argued Sept. 28, 1993.

Supplemental Submission Jan. 11, 1994.

Decided Feb. 9, 1994.

Stephen McCarron (argued), Louis W. Dies, III, McCarron & Associates, Silver Spring, MD, for appellants.

Karen Shichman Crawford (argued), Elise Glenn, Buchanan Ingersoll, Professional Corp., Pittsburgh, PA, for appellee, The Union National Bank of Pittsburgh.

Before: SCIRICA, ALITO, and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Plaintiffs-appellants Consumers Produce Co., Inc. of Pittsburgh et al. filed this action to recover loan repayments made to defendant Union National Bank of Pittsburgh (UNB) by defendant Volante Wholesale Produce, Inc. (Volante). Plaintiffs alleged that the loan repayments were made in breach of a statutory trust created for their benefit under the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499e *et seq.* After trial the district court entered judgment for UNB.

The district court had jurisdiction under 28 U.S.C. § 1331 and 7 U.S.C. § 499e(c)(4). We have jurisdiction over this appeal from a final judgment of the district court under 28 U.S.C. § 1291.

## I. BACKGROUND

A. *The Perishable Agricultural Commodities Act*

PACA was enacted in 1930 to promote fair trading practices in the marketing of perishable agricultural commodities, large-

ly fruits and vegetables. The statute was amended in 1984 to create a statutory trust for the benefit of unpaid produce suppliers.

■ Under the trust provision, commission merchants, dealers, and brokers who receive perishable agricultural commodities hold them in trust for produce suppliers until the suppliers are fully paid. The trust is a floating, non-segregated, statutory trust which extends not only to commodities, but also to inventories of food or other products derived from the commodities and receivables or proceeds from the sale of the commodities or products. 7 U.S.C. § 499e(c)(2).

■ An unpaid produce supplier or seller must give written notice of its intent to preserve trust benefits to the produce dealer, broker, or commission merchant within thirty (30) days after payment is due. The notice of intent must also be filed with the Secretary of Agriculture. *Id.* at § 499e(c)(3).

The statute vests the United States district courts with jurisdiction over actions by trust beneficiaries to enforce payment from the trust and actions by the Secretary of Agriculture to prevent dissipation of the trust. *Id.* at § 499e(c)(4).

### B. *Facts*

On April 8, 1988, UNB provided a $565,000 term loan to Jeffrey Robinson to purchase the business of Volante through a leveraged buyout. Volante was a produce dealer subject to the provisions of PACA. On the same date, UNB provided a line of credit to Volante, for short-term working capital needs, in the amount of the lesser of $300,000 or 80% of current accounts receivable. Volante's line of credit was later increased by UNB to $450,000 and then to $1,000,000.

The term loan and the line of credit were secured by a first priority lien against Volante assets, including real property, all attachments thereto, all equipment, vehicles, furniture, fixtures and intangibles, and all accounts, contract rights, and inventory.

UNB's security interest in Volante thus covered assets subject to the PACA trust.

From Spring 1988 until September 14, 1990, Volante made principal and interest payments to UNB on both the term loan and the line of credit in the ordinary course of business.

Starting in March 1989, Volante began receiving "notices of intent to preserve trust benefits" under PACA from its unpaid produce suppliers. However, all produce suppliers were ultimately paid by Volante through June 1990. Volante began experiencing serious trouble in paying its suppliers during the summer months of 1990.

On September 18, 1990, three unpaid produce suppliers commenced this action against defendant Volante to recover PACA trust assets created through the sale of produce to Volante. UNB was not a named defendant in the initial complaint.

On September 26, 1990, the parties entered into a consent order whereby Volante agreed to pay the plaintiffs $10,000 per week. Volante failed to abide by the order and went out of business in October 1990. The district court then appointed a trustee to collect Volante's accounts receivable on behalf of all PACA trust creditors. The trustee collected approximately $455,000.

Other PACA trust creditors of Volante then intervened in the action and the district court found that $780,343.11 in valid unpaid PACA trust claims existed. Volante's accounts receivable were disbursed to the creditors, leaving a balance of $325,343.11 owing to the plaintiffs.

On August 9, 1991, the district court approved plaintiffs' motion to join UNB as a defendant. In their second amended complaint, plaintiffs alleged that between July 20, 1989 and October 20, 1990, UNB received loan repayments in excess of $325,343.11 from Volante in breach of a PACA trust.[1] The plaintiffs claimed that UNB should disgorge sufficient loan payments to cover Vo-

---

1. The record indicates that between July 18, 1989 and September 14, 1990, Volante paid UNB approximately $1 million in principal and interest payments on its term loan and line of credit. J.A. at 483–85. The last loan payment from Volante to UNB was made on September 14, 1990.

lante's $325,343.11 deficiency to the produce suppliers under PACA.

In its pretrial order, the district court limited discovery and trial to (a) whether UNB was a bona fide purchaser for value with respect to the loan payments it received from Volante and (b) whether the bank received such payments "without notice of a breach of trust" by Volante.

After a nonjury trial, the district court held for UNB. Relying on *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311 (11th Cir.1992), the district court applied traditional trust principles to find that UNB was a bona fide purchaser for value that received loan payments without notice of Volante's breach of trust. Therefore, it held that UNB need not disgorge the loan repayments to the produce suppliers. This timely appeal followed.

## II. DISCUSSION

The PACA statute was amended in 1984 to create a trust for the benefit of unpaid produce suppliers. The amendment begins with a legislative finding that:

> a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities ... encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products.... This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1).

To remedy this burden, Congress enacted the following trust provision:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transaction has been received ...

*Id.* § 499e(c)(2).

■ The trust provision requires produce purchasers to hold sufficient PACA trust assets in trust to pay all suppliers. Read in light of the legislative finding, the trust provision also straightforwardly provides unpaid suppliers with priority over secured lenders with regard to PACA trust assets *held in trust* by produce purchasers. It effectively vitiates a lender's security interest in trust assets *held by produce purchasers* vis a vis unpaid produce suppliers. *See* Explanation of the Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust, 49 Fed.Reg. 45735, 45738 (1984) (hereinafter "Explanatory Note").

As a produce purchaser, Volante served as a statutory trustee and was required to hold sufficient PACA trust assets in trust until suppliers, like the plaintiffs, were fully paid. Plaintiffs allege that between July 20, 1989 and September 14, 1990, Volante transferred PACA trust assets in breach of the PACA trust to UNB in the form of loan repayments in the ordinary course of business. Because it does not affect our result, we assume without deciding that Volante used PACA trust assets and breached the PACA trust in making the loan payments to UNB from July 20, 1989 to September 14, 1990.[2]

---

2. The district court assumed without deciding that Volante used PACA trust assets to make loan payments to UNB during this period. However, the district court questioned whether a breach of trust transpired throughout the entire period claimed by the plaintiffs. The district court found plaintiffs' selection of July 20, 1989 as the start of the time period for the breach of trust to be "arbitrary" given evidence at trial that Vo-

lante's produce suppliers were fully paid through June 1990. See Op. at 19–20 n. 40, 27 n. 43.

However, the district court never made an explicit finding on the period during which Volante breached its trust to the plaintiffs by making loan payments to UNB. Because the period involved does not affect our result, we assume

■ The PACA trust provision does not indicate whether third-party transferees, like UNB, who receive trust assets in breach of trust, are required to disgorge such assets to trust beneficiaries. However, the parties and the district court agree that third-party transferees may retain PACA trust assets without liability to trust beneficiaries if they are bona fide purchasers for value and without notice of the breach of trust.

The bona fide purchaser defense is defined by the *Restatement (Second) of Trusts* as follows:

> (1) If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary. (2) In the Restatement of this Subject such a transferee is called a "bona fide purchaser."

§ 284 (1959).

■ Plaintiffs concede that UNB received the loan payments from Volante "for value." The transfer of trust assets in satisfaction of a pre-existing debt is normally not for value; however, an exception exists where the trust property transferred is a negotiable instrument or money. RESTATEMENT (SECOND) OF TRUSTS § 304 (1959). This exception arises from the necessity "for practical business transactions that the payee of

money in due course of business shall not be put upon inquiry at his peril as to the title of the payor." 4 AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 304. Because UNB received PACA trust assets in the ordinary course of business as monetary loan repayments, the transfer was for value.[3]

■ Plaintiffs contend that UNB cannot qualify for bona fide purchaser protection because the bank had notice that Volante was breaching the PACA trust by making its loan payments. Under the *Restatement (Second) of Trusts*,

> [a] person has notice of a breach of trust if
> (a) he knows or should know of the breach of trust, or
> (b) by statute or otherwise he is subjected to the same liabilities as though he knew or should have known of the breach of trust, even though in fact he did not know and had no reason to know of the breach of trust.

§ 297 (1959). Subpart (a) represents the traditional trust law approach to notice of breach of trust. Subpart (b) provides an exception to traditional trust law principles where a statute provides constructive notice of breach of trust to third party transferees.

The district court applied the traditional trust law approach under § 297(a) and determined that UNB did not have notice of Volante's breach of trust. Plaintiffs contend that the district court first erred by applying the traditional trust standard and refusing to

---

that Volante breached the PACA trust throughout the entire period claimed by the plaintiffs.

3. While loan repayments in the ordinary course of business are "for value," we note that

> [w]hen secured lenders use their security agreement to foreclose on property or otherwise enforce their contractual rights, they essentially force the transfer of trust property in satisfaction of an antecedent debt. Any such transfer, including transfers of negotiable instruments and money, through the exercise of rights under a security agreement is not for value. Most trust assets such as inventory or accounts receivable will be converted to money before being transferred. To hold otherwise would essentially permit secured creditors to "trump" unpaid beneficiaries of PACA trusts by simply enforcing their security agreement outside of the formalities of bankruptcy.

*C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1315 n. 5 (11th Cir.1992).

The "for value" portion of the bona fide purchaser standard thus only protects secured lenders who receive PACA trust assets in the ordinary course of business. Lenders who seize PACA trust assets through the enforcement of a security agreement will not be protected by the bona fide purchaser defense because such a transfer will not be "for value."

Applying the "for value" portion of the bona fide purchaser defense thus complies with the PACA statute's legislative finding that secured financing arrangements involving PACA trust assets are a burden on commerce. The defense protects unpaid suppliers from the seizure of PACA trust assets by secured lenders while maintaining ordinary credit relations that provide liquidity to the produce industry.

find that the PACA statute alone imposed notice of Volante's breach of trust on UNB under § 297(b). Plaintiffs also contend that under the facts of the case, the district court erred in concluding that UNB "should not have known" of the breach of the PACA trust under § 297(a).

### A. Notice of Breach of Trust by Statute

■ Plaintiffs' first contention challenges the legal standard applied by the district court to determine whether UNB had notice of the breach of trust by Volante. The district court's conclusions of law are subject to plenary review. *Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir.1991).

Plaintiffs contend that when a produce purchaser breaches a PACA trust by transferring trust assets to lenders with security interests in those assets, the mere existence of the PACA statute provides notice of the breach of trust to those lenders and defeats the bona fide purchaser defense. In effect, plaintiffs argue that the PACA statute overrides traditional trust protection and that secured lenders are strictly liable to trust beneficiaries for any trust assets received in breach of trust.

■ We find no express language in the PACA statute which alters the application of the traditional trust standard for notice of breach of trust to third party transferees, including secured lenders. Congress could easily have imposed strict liability on secured lenders by making them trustees or guarantors of the PACA trust. However, the statute does not incorporate such language. In fact, the explanatory note to the regulations implementing the PACA trust states that

> [t]rust assets are available for other uses by the buyer or receiver. For example, *trust assets may be used to pay other creditors. It is the buyer's . . . responsibility as trustee to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment.*

4. It is of interest to note that in the 102d Congress, legislation passed the House of Representatives that would have amended the PACA trust provision to make secured lenders trustees of the

Explanatory Note, 49 Fed.Reg. 45738 (emphasis added). The produce purchaser is the trustee of the trust and creditors are not insurers of unpaid beneficiaries when they receive trust assets in breach of trust.[4]

In *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311 (11th Cir.1992), the Eleventh Circuit concluded in dicta that traditional trust protections apply to secured lenders who receive PACA trust assets in breach of a PACA trust. *Id.* at 1314–16. The *C.H. Robinson* court admonished the district court for holding a secured lender strictly liable to unpaid trust beneficiaries:

> The district court . . . transcended traditional trust analysis and, in effect, held that lenders are strictly liable to the extent that they have a security interest in trust assets. This is contrary to both the cases . . . and legislative intent. Congress has provided the unpaid sellers of perishable agricultural commodities with the benefits of a statutory *trust*. Absent specific instructions to the contrary, Congress must have intended for such a trust to operate according to the settled principles of trust law . . . There is no legitimate basis for creating a special exception to these principles for secured lenders. Secured lenders are not guarantors of PACA trusts. Indeed, their "secured" status is effectively vitiated by PACA in favor of unpaid trust beneficiaries. The district court's imposition of strict liability has the ironic effect of placing . . . . the secured lender, in a worse position than [a bank] whose loans were unsecured.

*Id.* at 1316.

The *C.H. Robinson* court found that the PACA statute provides secured lenders with notice of the statutory trust, not notice of the *breach* of trust by a PACA trustee. *Id.* at 1314, 1315 n. 4. It noted that breach of trust is required for liability to attach under traditional trust law. *See* RESTATEMENT (SECOND) OF TRUSTS § 296 (1959):

> If the trustee transfers trust property in breach of trust to a transferee for value,

PACA trust. *See* H.R. 5741, 102d Cong., 2d Sess. (1992). The legislation, however, was not passed by the United States Senate and has not been enacted into law.

the transferee takes free of the trust although he had notice of the existence of the trust, unless he has notice that the trustee is committing a breach of trust in making the transfer.

A number of courts have followed the *C.H. Robinson* approach and held that secured lenders are entitled to present a bona fide purchaser defense under the PACA statute using traditional trust law principles. *See Sheppard v. KB Fruit & Vegetable, Inc.,* Civ.A. No. 91–6624, 1993 WL 21008 (E.D.Pa. Jan. 12, 1993); *Merrill Farms Corp. v. H.R. Hindle & Co.,* 149 B.R. 775 (Bankr.E.D.Pa. 1993); *A & J Produce Corp. v. CIT Group/Factoring, Inc.,* 829 F.Supp. 651 (S.D.N.Y.1993).

Plaintiffs argue that *First State Bank v. Gotham Provision Co. (In re Gotham Provision Co.),* 669 F.2d 1000 (5th Cir. Unit B), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982), provides precedent for imposing notice of breach of trust on secured lenders by statute, holding such lenders strictly liable, and requiring them to disgorge to unpaid suppliers trust assets received in breach of trust.

■■■ However, *In re Gotham* is distinguishable from the current case because it involved a secured lender who seized trust assets to enforce a security agreement in the context of a bankruptcy. *Id.* at 1003.[5] Such transfers of trust assets are not protected by the bona fide purchaser defense because they are not "for value." *See* RESTATEMENT (SECOND) OF TRUSTS § 304 (1959). Therefore, the *In re Gotham* court properly required the secured lender to disgorge the seized trust assets to unpaid trust beneficiaries. *Id.* at 1009–10. *In re Gotham* does not conflict with the application of traditional trust principles through the bona fide purchaser standard; it simply imposed liability on a secured lender who did not qualify for bona fide purchaser protection.

In another context, the *In re Gotham* court noted that

According to general principles of trust law ... where trust funds are commingled with funds not subject to the trust, a lien on the entire commingled fund exists for the benefit of the beneficiaries of the trust, and those who receive a transfer of assets from the commingled fund with actual or constructive notice of the trust are subject to the lien.... In this case, the Bank had constructive notice of the trust because a federal statute created the trust.

*Id.* at 1011. Plaintiffs argue that this language imposes notice of breach of trust by statute upon secured lenders who receive trust assets in breach of the PACA trust. We conclude, however, that the *In re Gotham* court simply misread traditional trust law principles and confused "constructive notice of the trust" with "notice of the *breach* of trust." *See* RESTATEMENT (SECOND) OF TRUSTS § 296 (1959).

■■■ We therefore hold that the appropriate legal standard for determining whether a lender with a security interest in PACA trust assets has notice that a produce purchaser is breaching the PACA trust by making loan payments in the ordinary course of business is set forth in *Restatement (Second) of Trusts* § 297(a): "A person has notice of a breach of trust if (a) he knows or should know of the breach of trust." The district court applied the proper legal standard to determine whether UNB had notice of the breach of trust by Volante.

### B. *Application of § 297(a)*

Plaintiffs next argue that the district court improperly applied the notice of breach of trust legal standard.

---

5. *In re Gotham* involved a similar trust provision for livestock products created under the 1976 amendments to the Packers and Stockyards Act (PSA), 7 U.S.C. §§ 181–229. The PACA trust provisions were modeled after the PSA trust provisions and authority developed under that statute is persuasive in the interpretation of the PACA trust. *In re Fresh Approach, Inc.,* 48 B.R. 926, 931 (Bankr.N.D.Tex.1985). The controversy in the case arose out of the bankruptcy of a meat packer, Gotham Provision Co., Inc. During a five-week period ending one week after the bankruptcy, Gotham's secured lender, aware of the meat packer's financial problems, received payments from Gotham's accounts receivable (which constituted trust assets) and reduced the balance on a loan to Gotham by over $300,000. *Id.* at 1003.

### 1. Burden of Proof

After certain supplemental proceedings, the parties and the district court agreed that UNB had the burden of proving that it was a bona fide purchaser with respect to the loan payments received from Volante during the period in question. We concur in that agreement.

### 2. Factual Application of § 297(a)

Plaintiffs concede that UNB lacked actual knowledge of the breach of trust by Volante. However, they contend that the district court erred by inferring from relatively undisputed facts that UNB should not have known of the breach of trust by Volante. The district court's findings of fact and reasonable inferences therefrom are subject to the clearly erroneous standard of review. *Martin v. Selker Bros.*, 949 F.2d 1286, 1292 (3d Cir. 1991); FED.R.CIV.P. 52(a).

In addressing whether UNB "should have known" of Volante's breach of trust, the parties utilize a duty of inquiry analysis, derived from the *Restatement (Second) of Trusts,* which was not explicitly applied by the district court. However, the district court's factual findings comport with the duty of inquiry analysis, and it effectively applied that analysis to determine whether UNB should have known of the breach of trust. We therefore consider the district court's factual findings in light of the duty of inquiry analysis and undertake plenary review of any legal questions associated with that analysis.

Under the Restatement (Second) of Trusts:

[a] third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is *when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust,* and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

§ 297 comment a (emphasis added).

Thus, a duty of inquiry arises when a person knows facts which under the circumstances suggest (1) that the person is dealing with a trustee and (2) that the trustee may be committing a breach of trust. If a duty of inquiry exists, and such inquiry would have disclosed the breach of trust, a person "should have known" of the breach of trust.

The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property. SCOTT & FRATCHER, *supra,* § 297. In the PACA context, a duty of inquiry arises when a third-party transferee has knowledge that a produce purchaser/trustee is not paying produce suppliers or is in financial difficulty.[6]

The parties and the district court agree that UNB was charged with constructive knowledge of the PACA statute and the trust created thereunder. UNB was also aware that Volante was a produce wholesaler whose principal business was the purchase and resale of produce on credit. Therefore, UNB was charged with the knowledge that it was dealing with a PACA trustee.

However, the district court effectively held that until August 1990 UNB was not aware of facts that under the circumstances would suggest that Volante was breaching its PACA trust by making loan payments. Op. at 29. The district court found that Jeffrey

---

**6.** A third party's knowledge that a transfer involves a PACA trustee and the transfer of trust assets is insufficient alone to create a duty of inquiry. As noted previously, the explanatory note to the regulations implementing the PACA trust states that, "[t]rust assets are available for other uses by the buyer or receiver. For example, trust assets may be used to pay other creditors. It is the buyer's responsibility as trustee to insure that it has sufficient assets to assure prompt payment of produce and that any benefi- ciary under the trust will receive full payment." Explanatory Note, 49 Fed.Reg. 45738 (1984). The transfer of trust assets is legitimized by the explanatory note and third party transferees should only be put on inquiry as to a breach of the trust if they are aware of facts under the circumstances which indicate that suppliers are not being paid or that the trustee has insufficient assets to both make the transfer and pay suppliers.

Robinson, the owner of Volante, prevented UNB from learning of Volante's failure to pay produce suppliers and Volante's financial difficulties. *Id.* Therefore, UNB did not have a duty to inquire and should not have known that Volante was breaching the PACA trust prior to August 1990. As demonstrated by the following findings of fact, which are either undisputed or supported by evidence in the record, the district court's factual determination was not clearly erroneous.

First, in its loan agreement with Robinson, UNB required Volante to pay all liabilities when due, to comply with all applicable laws, and to notify the bank of any material litigation. Op. ¶ 5. However, Robinson failed to notify UNB of the receipt of any PACA trust notices or of the nonpayment of produce suppliers in violation of the PACA statute until September 17, 1990. Op. ¶ 24; J.A. at 751–54, 1304–07, 1314. There is no evidence in the record demonstrating that UNB was aware, prior to September 17, 1990, that Volante was not paying its produce suppliers in a timely manner.

Second, despite reviewing financial information from Volante, UNB was unaware that the produce purchaser was experiencing financial difficulties until August 1990. Op. ¶¶ 12, 21. Under the loan agreement, Robinson agreed to furnish UNB with substantial financial information on Volante, including borrowing base certificates, accounts receivable summary aging reports, unaudited quarterly financial statements, and annual financial statements prepared and reviewed by an independent certified public accountant. Op. ¶ 5; J.A. at 688–89.[7] The financial information required under the loan agreement was provided to UNB throughout the period in question and reviewed by UNB officials. Op. ¶ 12. A UNB loan officer testified that UNB had no reason to doubt the accuracy of the financial figures and that the information

demonstrated that Volante was modestly profitable and paying its trade creditors. *See* J.A. at 1117–18, 1120–21, 1136–41.

The record demonstrates that Robinson concealed Volante's financial troubles by (1) deliberately inflating the amount of Volante's accounts receivable in its borrowing base certificates, and (2) skewing the figures in the quarterly financial statements and the figures given to the outside CPA for the annual financial statements to make Volante appear more profitable. Op. ¶ 18, J.A. at 1307–14. An independent CPA testified that no "red flags" existed in the financial statements which would have alerted UNB to Robinson's financial manipulations or to the fact that Volante was having financial difficulties. Op. ¶ 18; J.A. at 1313–14. Volante also concealed its financial difficulties by making regular principal and interest payments to the bank. Op. at 29; J.A. at 749–50.

Volante's checking account was frequently overdrawn prior to August 1990 and the company did not perform up to the financial projections made by Robinson. Op. ¶ 12 & nn. 20–21. However, both Robinson and a bank official testified that the overdraws on the checking account were a common practice among borrowers to avoid the interest costs associated with further draws on the line of credit, and that such overdrafts were always immediately covered by either Volante deposits or draws on the line of credit. Op. ¶ 12; J.A. at 659–60, 1027–28. As for Robinson's financial projections, a bank official testified that such projections are normally a best case scenario and that Volante provided reasonable explanations of discrepancies between actual and projected performance. J.A. at 1010–14.

Plaintiffs contend that from the start of UNB's relationship with Volante, UNB was aware of facts that would suggest that the produce purchaser was financially incapable

---

7. In the financial statements, Robinson was obligated to certify that he was familiar with the books and records of Volante and that the figures reflected in the financial statements were true and correct to the best of his knowledge and belief. Op. ¶ 5, n. 10. Volante also agreed that it would be in default of the loan agreement if any warranty, representation or statement made to the bank proved to be false or misleading in

any material respect when made or furnished. Op. ¶ 6.

At the bottom of each borrowing base certificate, Robinson certified that its calculation of eligible accounts receivable was accurate and that all representations, warranties and agreements under the loan agreement were true, correct, and performed by Volante. Op. ¶ 7 & n. 11; J.A. at 136.

of paying both suppliers and the bank. Plaintiffs point to the district court's finding of fact that:

> [a] first priority security interest was critical to UNB's decision to extend the loan and the line of credit to Mr. Robinson. If any loan officer of UNB had been aware of PACA, which gave produce suppliers and sellers a first priority security interest in certain assets of Volante[,] ... the loan and the line of credit would not have been extended.

Op. ¶ 4.

Plaintiffs argue that UNB's admission that it would not have made its loan to Volante if it had known of its subordinate position to produce suppliers under PACA indicates that Volante's financial statements reflected insufficient assets to pay both suppliers and the bank. As UNB was charged with constructive knowledge of the PACA statute, plaintiffs contend that the lender, throughout its lending relationship with Volante, should have inquired into and discovered Volante's breach of trust to produce suppliers.

However, UNB's admission that it would not have extended the loan and the line of credit to Volante if it had known about PACA may merely reflect the bank's lending policy and risk-aversion, rather than Volante's actual financial condition or failure to pay trade creditors. A lender's policy on extending subordinated credit does not directly correlate to a borrower's financial solvency or ability to pay produce suppliers.[8]

We therefore conclude that the district court's inference that until August 1990 UNB had no duty to inquire and should not have known of the breach of trust by Volante is not clearly erroneous.

The district court found that in August 1990, UNB undertook an extensive inquiry into Volante's financial condition after Volante's checking account overdrafts increased in frequency and magnitude. Op. ¶ 15. UNB requested additional financial information from Volante and two independent financial consultants were retained to review Volante's financial records, perform a collateral evaluation, and review general operations. Op. ¶ 16.

While this inquiry disclosed poor accounting and financial irregularities at Volante, it did not demonstrate that Volante lacked sufficient funds to pay its produce suppliers; due to inaccurate financial information presented by Robinson to one of the independent financial consultants, the inquiry indicated that Volante's accounts receivable exceeded its accounts payable. Op. ¶¶ 18–21.[9]

The district court effectively held that in August 1990, UNB undertook a reasonable inquiry into Volante's financial condition that did not disclose Volante's breach of trust under PACA. Therefore, the district court inferred that UNB should not have known of the breach of trust by Volante. The district court's factual determination was not clearly erroneous.

## C. CONCLUSION

■ We conclude that UNB was a bona fide purchaser for value and discharged its burden of showing that it was without notice of the breach of the PACA trust by Volante in relation to the loan repayments made in the ordinary course of business. As such, UNB is not required to disgorge the loan payments received in breach of the PACA trust. Our conclusion renders it unnecessary to consider other contentions advanced by plaintiffs.

**8.** In fact, at the time UNB extended the term loan and initial line of credit, the seller of Volante, Anthony Volante, agreed to subordinate a $532,000 note from Jeffrey Robinson to UNB's debt. Anthony Volante's willingness to subordinate this debt demonstrates his strong confidence in the financial viability of the company. However, neither UNB's unwillingness to subordinate debt to PACA suppliers nor Anthony Volante's willingness to subordinate debt to UNB provides a definitive basis upon which to determine that Volante was in financial difficulty or

not paying its suppliers. On these facts, the district court's rejection of the plaintiff's hypothetical approach to creating a duty of inquiry is not clearly erroneous.

**9.** The review indicated that on August 20, 1990, Volante had an outstanding balance of $665,000 on its accounts payable and an outstanding balance of $954,390 on its accounts receivable. Op. ¶ 21 n. 30. The company appeared to have sufficient assets to pay suppliers.

The judgment of the district court will be affirmed.